[No. 23551.  *En Banc.*  October 3, 1932.]

*In the Matter of the Estate of* LOUISE HANSON, *Deceased.*

PETER NERHEIM *et al., Appellants,* v. JOHANNA MARIE OVERAA NIELSON, *as Executrix, Respondent.*[1]

*Chadwick & Chadwick (K. T. Dahlen,* of counsel), for appellants.

*Q. A. Kaune* and *Coleman & Fogarty,* for respondent.

BEALS, J.—The superior court for Snohomish county having admitted to probate as the last will and testament of Louise Hanson (who died October 22, 1930, aged seventy-five years) a document of a testamentary nature, bearing date July 21, 1930, Peter Nerheim, a nephew of Mrs. Hanson, and the Norwegian Synod of the American Evangelical Lutheran Church (which will hereinafter be referred to as the Synod) instituted a contest, attacking the will on the grounds of mental

[1] Reported in 14 P. (2d) 702.

incapacity of the testatrix and undue influence. The contest was resisted by Johanna Marie Overaa Nielson, named in the will as executrix, who, with her two children, are residuary legatees thereunder. From a decree dismissing the contest and sustaining the will, Mr. Nerheim and the Synod appeal.

The following facts clearly appear from the record: Louise Hanson, the testatrix, was left a widow during the year 1918, at which time she had two sons, Herman and Carl. Herman died in 1922, and Carl in 1926, neither boy leaving widow or child. Mrs. Hanson was the owner of a valuable dairy ranch in Snohomish county worth approximately forty thousand dollars, and she also owned personal property of considerable value, including a five thousand dollar note and mortgage which she inherited from her son Carl.

Johanna Marie Overaa, a daughter of Mrs. Hanson's sister, during the year 1909 came from Norway to visit Mrs. Hanson. She remained in this country approximately five years, when she returned to her home in Norway. During the year 1925, and prior to the death of Mrs. Hanson's son Carl, Johanna returned to this country (Mrs. Hanson furnishing her transportation) and took up her residence with her aunt. After Carl's death, Mrs. Hanson continued the employment of one Adolph Nielson (who had been engaged by Carl) to assist in the care of the stock, and March 4, 1927, much against Mrs. Hanson's wishes and under circumstances extremely distasteful to her, Johanna Overaa and Nielson were married.

Mr. J. P. Wall, who for some years represented Mrs. Hanson as her attorney, testified that, after the death of her son Carl, to whom Mrs. Hanson had willed practically all of her estate, Mrs. Hanson executed a new will, naming Johanna as her principal beneficiary. In January, 1927, when Mrs. Hanson learned of the con-

templated marriage of Johanna and Nielson, she executed a new will, bequeathing to Johanna three thousand dollars only, to her sister, Olave Overaa, five thousand dollars, and naming the Synod as her residuary legatee. Mr. Wall testified that Mrs. Hanson then stated that she disapproved of her niece's marriage. The will last mentioned and the wills hereinafter referred to were introduced as exhibits in the case, and are before us. Dr. W. T. Christensen, a friend upon whom Mrs. Hanson relied for counsel and advice, was named as executor of this will.

Sometime during the year 1927, Mrs. Hanson apparently became dissatisfied with Mr. Wall because of the friendship existing between him and the Nielsons, and Mrs. Hanson thereafter employed A. S. Ryland, an attorney residing in the city of Seattle, as her counsel. September 16, 1927, Mr. Ryland, at Mrs. Hanson's request, prepared for her another will, in terms very similar to the will just referred to, save that Mrs. Hanson added a bequest to her cousin, Ellen Stavdahl, in the sum of five hundred dollars.

March 28, 1928, Mrs. Hanson executed another will, prepared by Mr. Ryland, in which the bequest to Johanna was reduced from three thousand dollars to five hundred dollars, and that to her sister, Olave, from five thousand dollars to two thousand dollars. Some other changes were made, including a new devise in the sum of two thousand dollars to her brother, the father of Peter Nerheim. A son born to Johanna received a bequest of five hundred dollars.

After their marriage, the Nielsons continued to live on the Hanson property, residing in a small house some fifty feet distant from that occupied by Mrs. Hanson. They worked on the place under an agreement which was to expire during the year 1929. In 1928, Mrs. Hanson, being dissatisfied with the Nielsons

and desiring their removal from her property, entered into an agreement with one Virgil Dawley, a neighbor, whereby she leased her property to Mr. Dawley, and under this agreement the lessee took possession during the month of March, 1929; whereupon Mr. and Mrs. Nielson removed from the Hanson property.

March 2, 1929, Mrs. Hanson made a new will, containing no bequest to Johanna, although she continued the five hundred dollar bequest to Johanna's child. In this will, Mrs. Hanson's nephew, Peter Nerheim, was bequeathed five hundred dollars. The testatrix also established a trust fund of five hundred dollars to secure the care of her cemetery lot. She continued the Synod as her residuary legatee, and named Dr. Christensen as her executor.

During the year 1928, Mr. and Mrs. Rygg, who were neighbors and friends of Mrs. Hanson, left their farm, which was near the Hanson place, and moved to Stanwood. Mrs. Hanson, at her own desire, lived with them for a short period. For about nine months prior to this, Miss Ida Rygg had, at Mrs. Hanson's request, passed almost every night at Mrs. Hanson's home, the latter not wishing to be alone in her house. During this period of time, Mrs. Hanson's anger at the Nielsons is very apparent.

During the summer of 1928, Mrs. Hanson attended a conference of the branch of the Norwegian Lutheran Church to which she belonged, held at Mankato, Minnesota, where, apparently with her consent, a public declaration was made of her intention, as expressed in her will then in force, to make the Synod representing that church the chief beneficiary under her will. Upon her return to the state of Washington, and apparently in order to live near the only church pertaining to that particular branch of the Lutheran faith to which she subscribed, Mrs. Hanson took up her residence in the

town of Parkland, near Tacoma, where she purchased a home.

During the fall of 1929, Mrs. Hanson was stricken with pneumonia and later suffered severely from erysipelas. Until her death, approximately ten months later, Mrs. Hanson was extremely feeble, her mental and physical powers failed, and during much of the time she required the constant attendance of a nurse.

It does not appear that Mrs. Hanson and her niece, Johanna Nielson, saw each other from the time Mrs. Hanson left her ranch until sometime early in December, 1929, when Mrs. Nielson, having been informed of Mrs. Hanson's illness, went to Parkland and spent a few days with her aunt. Shortly after this visit, December 7, 1929, Mrs. Hanson executed a codicil to her will, bequeathing to Johanna the sum of five hundred dollars. This codicil Mrs. Hanson signed by making her mark thereon.

During the period of her sickness in Parkland, Mrs. Hanson's nephew, Peter Nerheim, and his family visited her frequently, and saw to it that she was properly cared for. It clearly appears that Mrs. Nerheim, for a considerable period of time, assisted Mrs. Hanson's nurses in caring for her, and was frequently in attendance.

January 29, 1930, Mrs. Hanson executed another codicil to her will, bequeathing to Mrs. Peter Nerheim her personal effects, and devising her home in Parkland, which adjoined the lands of the Parkland church, to that institution. This codicil Mrs. Hanson also signed by mark, the same by its form indicating increasing bodily weakness.

During this time, Mrs. Hanson was advised by Mr. Ryland, her attorney, and during the month of May, 1930, while Mrs. Hanson was in Seattle in the care of

her nurse, and in order to assemble all of her testamentary wishes into one document, Mrs. Hanson executed a new will (to which she attached her mark) bearing date May 19, 1930, which embodied the provisions of her previous will and the codicils thereto, the only addition being a five hundred dollar bequest to Betty, a second child who had recently been born to Adolph and Johanna Nielson. Mrs. Hanson continued the Synod as her residuary legatee, and again named Dr. Christensen as her executor and trustee of the fund provided for the care of the family graves.

This is the document which appellants contend constitutes Mrs. Hanson's last will and testament, appellants contending that the two later wills executed by Mrs. Hanson are void.

Between May 19 and June 2, 1930, F. A. Christensen, a nephew of Dr. W. T. Christensen and a son of Dr. F. A. Christensen, who for some years and until his death had been Mrs. Hanson's physician, appears upon the scene. Mr. Christensen was an enterprising young man engaged in the bond brokerage business, and it occurred to him that it would be a good idea if Mrs. Hanson's property and business were turned over to him (Christensen) as trustee.

Mr. Christensen testified that he discussed this matter with Mr. Wall, and that Mr. Wall stated that Mrs. Nielson had a possible claim to Mrs. Hanson's ranch, based upon some supposed agreement between Mrs. Hanson and her niece to the effect that Mrs. Hanson would sometime, in some manner, turn the property over to Mrs. Nielson in consideration of care, association, etc. Mr. Christensen further testified that he then went to Mr. Nielson and offered to attempt to induce Mrs. Hanson to give the property to the Nielsons if they would give him (Christensen) one-quarter of the value of the property, the total value of which

the parties estimated at forty thousand dollars. Mr. Christensen testified (many of his statements being disputed by the Nielsons):

"I then put up my plan to him (Nielson), that I would attempt to get the old lady to give the Nielsons this place, if they would give me one-quarter of the value of the place. It would be one-quarter of forty thousand dollars, which was ten thousand dollars. He told me that they had no such sum as that to pay, but I told him that I was perfectly willing to take a mortgage on the place, and that that would be our pay—that would be our compensation. And I told them that if they got the place, why we would have the mortgage on it, and we would thereby be secured. He seemed pleased with this, and I don't know whether he then called Mrs. Nielson, his wife, out to talk to us, or whether he went in and talked to her. Anyway, they seemed well pleased—"

Mr. Christensen then testified that, after coming to terms with Mr. Nielson, he undertook to work upon Mrs. Hanson, who was then a guest in his mother's home under the care of a trained nurse, and he, as he testified, told Mrs. Hanson

". . . that didn't she think that it would be a fair thing to see that the niece got the property? She had promised it to her. The niece, as I understood it, had always been willing to stay with her and deliver and fulfill her portion of the contract. I told her also that it would be nicer, I believed, and I thought she would believe it too, that the farm stay in the Hanson blood; that it would go to her niece, Mrs. Nielson, and it would then probably be passed down to her children, following the old country custom. And I talked with her—and I told her to think that over, and then I talked with her several times later along the same subject. Finally, about the—near the end of May, she agreed that that would be the fair thing to do. I notified Mr. Wall that she was willing to give the farm to her niece."

Mr. Christensen stated that he also asked Mrs. Hanson if she would care to have him act as executor of her will, to which he testified her exact answer was, "Yes, I would like that."

As a result of these negotiations, Mr. Wall called upon Mrs. Hanson, and a deed was prepared conveying the ranch from Mrs. Hanson to Mrs. Nielson, reserving a certain life interest in the grantor, Mrs. Hanson; also, a will was executed, dated June 2, 1930, in which it was recited that

"(8). I hereby mention the fact that I have transferred by deed my farm near Sylvana, Washington, to my niece, Johanna Marie Overaa Neilson, subject to a life estate in myself, and upon my death, the title to said farm shall be free from any claim of mine or my estate. This deed is made in fulfillment of my promise that she should have the farm if she left Norway at my request and came to America to live with me, and this she did."

Mrs. Hanson signed these documents, Mr. Wall guiding her hand. This will (non-intervention in character) named Mrs. Nielson and her two children as residuary legatees, and F. A. Christensen as executor, without bond. In the will of June 2, the bequest to Ellen Stavdahl was omitted, as were also the bequests to Peter Nerheim and Mrs. Nerheim and the devise of the home to the Parkland church. Mrs. Hanson's nurse was bequeathed three hundred dollars, a friend received one hundred dollars, the Parkland school one hundred dollars, and Dr. Christensen, who had been named as executor in five of Mrs. Hanson's former wills, received five hundred dollars, the trust for the cemetery lot being continued.

On the afternoon of the day Mrs. Hanson executed these instruments, Mr. Christensen, Mr. Wall and the Nielsons met for a further discussion of the situation. Mr. Christensen testified:

"There, we went over the agreement, and the terms of the contract, and Mr. Wall read the deed; the mortgage and the note to these two people, Mr. and Mrs. Nielson, and then handed these papers to Mrs. Nielson. She read them carefully and handed them over to her husband, who also read them. Q. What did they say about the consideration of the note, if anything? A. They said that it was very cheap, and Mr. Wall's answer was—well, he laughed and he said, 'Well, we surely don't like to be considered cheap, but we think it just and fair consideration that we reduce it voluntarily thirty-five hundred dollars.' Q. And after they had read the deed, you say, and the note and the mortgage, was the will shown to them at that time? A. Yes, it was. Q. Then what did they do? A. Well, as they completely understood it and were well pleased with it, they signed the note as co-makers there. They both signed the note, and I believe that they signed the mortgage, too. I know Mrs. Nielson said that she surely had not expected to get the farm."

Mr. and Mrs. Nielson then executed in favor of Mr. Christensen a note for six thousand, five hundred dollars, together with a mortgage covering the Hanson ranch, as Mr. Christensen testified, in consideration of the services which he and Mr. Wall had rendered in procuring the deed from Mrs. Hanson and the will in favor of Mrs. Nielson and her children. Mr. Christensen later stated that Mr. Wall had no interest in the note or mortgage.

Mrs. Hanson having left her Parkland home and established her home with the Nielsons, Mr. Nerheim June 17, 1930, instituted a proceeding before the superior court for Pierce county in which he sought to be appointed guardian of Mrs. Hanson. The material testimony introduced on the hearing in this petition is in the record. It was not disclosed that Mrs. Hanson had conveyed her ranch to her niece. Mrs. Hanson, testifying as a witness on her own behalf resisting the appointment of a guardian, was interrogated by Mr.

Wall concerning her ranch, and in answer to questions propounded to her by her counsel, referred to the lease which she had made to Mr. Dawley and the amount of rent payable thereunder, and testified that she had received the rent for the preceding month, which she had deposited in her bank.

In view of the fact that Mrs. Hanson had conveyed the ranch property to Johanna, reserving to herself "a life estate in said lands and the right to receive the rental therefrom of $75 per month during the term of" her natural life, this testimony was far from conveying to the court accurate information as to the true situation. Neither of the Nielsons testified.

The court refused to appoint a guardian, but in the course of deciding the matter, said:

"Is Mrs. Hanson mentally incompetent? This refers in the main to one whose mental faculties are so deficient that they are unable properly to take care of any property which he may have, where a person has some estate and he is frittering it away. People are causing him to do things which he ought not, and in that way, they are filching his property from him. It is very proper in a case of that kind to appoint a guardian to take care of his estate so that it be not lost. But in this case, that condition hardly exists because none of this property has been lost. Nobody has gotten any of this property from the old lady, as far as we know, . . . so it does not present to the court sufficient evidence to make me hand down a formal decree . . . that she is a mentally incompetent person. She is an old lady and has been sick and she is feeble and weak. A time may come and it may come before long, of course, when her mind will fail her and a guardian will be necessary, but I am not prepared to say that that time has arrived."

From this opinion, it is a reasonable inference that, had the trial court been advised that Mrs. Hanson had conveyed her lands, a different decision would have

been rendered, or, at least, further investigation would have been made.

It is very evident that the paragraph of the will of June 2, 1930, above quoted, stated an absurd proposition, as, at the time Johanna left Norway for the last time to take up her residence with her aunt, Mrs. Hanson's son Carl was still living, and Mrs. Hanson would never have made Johanna a promise to give her the ranch property while her son was still alive.

July 21, 1930, Mrs. Hanson executed another will, prepared by Mr. Wall, being the will admitted to probate herein and which appellants are contesting. Mrs. Hanson's nurse having been discharged, the bequest to her was omitted from this will. A fifty dollar bequest to Mrs. Hanson's cousin, Peter Stole, who had been called as a witness by the Nielsons at the guardianship hearing, was increased to five hundred dollars. The bequest to Dr. Christensen was eliminated, and Johanna was designated executrix of the will, she and her children being continued as residuary legatees. Referring to the deed in favor of Mrs. Nielson, this will recited:

"This deed is made in fulfillment of my promise that my said niece Johanna Marie Overaa Neilson should have said farm as promised by me if she would live with me and take Carl's place after his death. She has done this. It is the reward for her affection and companionship."

Shortly after the execution of this will, Mrs. Nielson demanded of F. A. Christensen the surrender of the mortgage which she and her husband had given him, later instituting an action to set the same aside, naming Mr. Christensen and Mr. Wall as defendants.

Mrs. Hanson died October 22, 1930, whereupon the will executed July 21, 1930, was filed and admitted to probate as Mrs. Hanson's last will and testament.

Mr. Nerheim then instituted this proceeding for the purpose of setting aside the probate of the will of July 21, and declaring void that of June 2, 1930. He also sought to set aside the deed to Mrs. Nielson bearing date June 2, 1930, and asked that the will which Mrs. Hanson executed May 19, 1930, be admitted to probate as her last will. Mr. Nerheim's interest in the matter is, of course, no greater than the establishment of the bequest of five hundred dollars in his favor and the bequest in favor of his wife covering personal property of small value. The Synod joined in the contest, and is interested therein to a very considerable extent.

The trial resulted, as above stated, in an order dismissing the contest.

Appellants assign error upon the finding entered by the trial court to the effect that Louise Hanson was, July 21, 1930, mentally competent to execute a will, and that, in executing the will which she signed that day, she was not acting under the undue influence of any person. Appellants also assign error upon the finding of the trial court to the effect that no undue influence was ever exercised by Johanna Nielson, or any person acting for her or with her knowledge, to procure the execution of the wills in Mrs. Nielson's favor. Appellants also assign error upon the entry of the court's conclusions of law and its decree against appellants, and upon the ruling of the trial court to the effect that the burden of proof at all times rested upon appellants to prove that Mrs. Hanson's will was procured through fraud or undue influence.

Respondent frankly concedes that Mrs. Hanson did not like Mr. Nielson, that she resented Johanna's marriage to him, and that the circumstances surrounding the same were extremely distasteful to her. It clearly appears that Mrs. Hanson was a very religious woman. Her faith and her church were to her matters of the

greatest importance, which occupied much of her thoughts and of her daily life. She was evidently a woman of considerable intellectual power; when she thought out a plan, she followed it with ability and consistency.

Notwithstanding her disapproval of her niece's conduct at the time of the latter's marriage, it is interesting to note that she did not entirely cut Johanna out of her will, but, on the contrary, for some time after the marriage carried her for a bequest in the sum of three thousand dollars, and bequeathed five hundred dollars to Johanna's son very shortly after the latter's birth. In the will in which this bequest appears, Johanna's interest was reduced from three thousand dollars to five hundred dollars. When Johanna's second baby was born, the child was at once named for a five hundred dollar bequest. These acts on the part of Mrs. Hanson show thought and consideration. Had Mrs. Hanson been motivated only by anger or pique, she would have left Johanna nothing, but until the execution of her will of March 2, 1929, Johanna remained a beneficiary under her aunt's will.

Mrs. Hanson's anger against the Nielsons evidently culminated during the winter of 1929, and the will which she made then included no bequest to Johanna, although the babe was still remembered.

Respondent argues that some of the members of Mrs. Hanson's church influenced her in favor of that organization. It is possible that they did, but we find in the record nothing upon which can be based any argument that any influence was exercised which could be denominated undue or improper.

We are clearly of the opinion that, at least up to and including the winter of 1929, Mrs. Hanson was in the possession of her mental power, and that it would have been very difficult for anyone to have influenced

her in any way against her inclination. Respondent concedes that Mrs. Hanson was much enfeebled by illness during the months of December, 1929, and January and February following. During this period, she was very ill, and we are of the opinion that the evidence conclusively shows that she never regained either her former mental or physical vigor.

The codicils to her will which she executed during this period indicate, however, the exercise by her of care and judgment. Her reinstatement of Johanna to the extent of five hundred dollars indicates a consistent line of thought, and her bequest to Mrs. Peter Nerheim of her personal effects indicates appreciation of kindnesses rendered, without any undue recognition thereof. Her bequest of her home in Parkland to the church also indicates thoughtful consideration.

The will of May 19, 1930, prepared by Mr. Ryland, also shows careful and coordinated attention. The five hundred dollar bequest to Johanna was continued, as was the bequest to Johanna's son. The baby girl recently born was bequeathed five hundred dollars. These bequests seem to show Mrs. Hanson's measure of appreciation of her niece and the latter's family; not indicating unreasoning anger or prejudice against them, but rather a measure of affection maintained over a considerable period of time, and in spite of her former disappointment and displeasure.

It can scarcely be believed that, but for the advent of F. A. Christensen, Mrs. Hanson would have made any considerable change in her testamentary disposition of her property.

The testimony is in conflict as to when Mr. Christensen first spoke to Mr. Nielson concerning his proposed scheme of inducing Mrs. Hanson to leave her property to Mrs. Nielson. Mr. Christensen testified that he discussed the matter with Mr. Nielson, and that it was

agreed between them that he (Christensen) should have ten thousand dollars if he could induce Mrs. Hanson to leave the farm to Mrs. Nielson, the amount having been later reduced to six thousand five hundred dollars at Mr. Christensen's suggestion.

Mr. Nielson denies that he met Mr. Christensen prior to May 29, 1930, and denies making any agreement whatsoever with him whereby Mr. Christensen would profit from any action which Mrs. Hanson might take in Mrs. Nielson's favor. Mrs. Nielson denies that she ever met Mr. Christensen before the day the note and mortgage were signed, and in this particular we assume that her testimony is true. In this connection, however, Mr. Nielson's testimony does not convince us of his truthfulness, and we are satisfied that some sort of an arrangement was made between Mr. Christensen and Mr. Nielson, substantially as testified by the former.

It is perfectly clear that it never occurred to Mrs. Nielson that she had any claim to any of Mrs. Hanson's property. Concerning this phase of the case, Mrs. Nielson testified:

"Q. After Carl died, did Mrs. Hanson say anything to you about giving you the farm? A. Yes, she did. Q. What did she say to you? A. Well, it was a few days after Carl died. She came and took me on the shoulder and she said, 'Now, Johanna, I want you to take Carl's place, and I want to give you the farm.' Q. Well, did you say anything to her? A. Well, I didn't say very much. Q. Well, at any rate,— A. (Interrupting) It was kind of a shock to me, she was going to give me the farm.''

This indicates no more than a feeling on the part of the grief-stricken mother, who had just lost her son, that her niece might fill some of the place in her life and heart left vacant by the death of her children, and

in time be the recipient of her bounty. None of the elements of a contract is even suggested.

The record before us is extremely voluminous, the statement of facts being more than eight hundred pages in length. A detailed analysis of the evidence is not practicable, nor would the same be profitable. We are of the opinion that Mrs. Hanson's acts of June 2, 1930, in conveying her ranch to Johanna and in making her will in Johanna's favor, were the result not only of influence, but of undue influence.

In determining whether or not a will is the product of undue influence, it is not necessary that the influence held undue be found to have been exerted directly by the beneficiary under the will. In the case of *Vanvalkenburg v. Vanvalkenburg,* 90 Ind. 433, the court said:

"If the free agency of the testatrix in making the will was destroyed by the undue influence of persons other than the contestee or devisee, it would make no difference whether such influence was used at her request, or with her consent, or not. If the free agency of the testatrix was destroyed by undue influence so that she made a will contrary to her judgment and intention, it is immaterial by whom such influence was exercised. The will in such case would be invalid."

The same doctrine finds support in Page on Wills (2d ed.), § 191.

Shortly after June 2, came the hearing on Mr. Nerheim's application for the appointment of a guardian for Mrs. Hanson. In view of the facts as they existed, this proceeding amounted to no more than a solemn farce. The true situation was not disclosed to the court, and the distressing affair was concluded to no good purpose, and had only the effect of placing Mrs. Hanson more completely under the control of the Nielsons.

Respondent admits that she would bear a heavier burden were she called upon to uphold the will of June 2, 1930, but she contends that the will of July 21 following, which was upheld by the trial court, is unassailable either upon the ground of mental incapacity or undue influence.

Here we have a situation disclosing a course of conduct persisted in over several years and consistently followed, as indicated by several wills and other evidence entitled to consideration. This plan was suddenly abandoned in favor of a relative, no nearer in degree to the testatrix than several others who were then living, and against whom anger and displeasure had been manifested for a considerable period. These circumstances, while not at all controlling, are entitled to weight in determining whether or not the influence, which it is admitted was brought to bear upon the mind and heart of Mrs. Hanson, passed the bounds of legitimate suggestion and became undue influence.

This is not of that class of cases in which a testator favored one whom he has brought up from childhood, as was the situation in the recent case of *In re Simpson's Estate, ante* p. 419, 14 P. (2d) 1, in which case no influence which affected the testamentary disposition of his estate made by Mr. Simpson was proven. It does not appear that Mrs. Hanson ever saw her niece until the latter was grown, and the record shows that for all actual service rendered by Johanna she was amply compensated.

Respondent relies upon the case of *In re Murphy's Estate,* 98 Wash. 548, 168 Pac. 175. It is true that, in the case cited, the court upheld a will in favor of one son and to the detriment of another, the facts indicating a lack of mental capacity on the part of the testator. While we are thoroughly in sympathy with the rule invoked by respondent to the effect that the right

to make a will is a valuable right, and that a will should be upheld unless strong reasons for holding it void appear, we are convinced that this case is governed by other principles than those which were held controlling in the case cited.

Without undertaking to decide whether or not Mrs. Hanson enjoyed a due measure of testamentary capacity during the months of June and July, 1930, we are of the opinion that the will of July 21 was clearly procured by and based upon the same undue influence which produced the will of the preceding month. These two wills are closely linked together, and we are unable to differentiate between them.

In the case of *Mowry v. Norman,* 204 Mo. 173, 103 S. W. 15, the court said:

"Nor is it required that the overt acts of undue influence were exercised at the exact time of the execution of the will, but it is sufficient to show that such influence over the mind of the testatrix had been acquired previously and did operate at the time of making the will in the disposition of the testator's property."

The following quotation from the opinion of the court in the case of *Davis v. Babb,* 190 Ind. 173, 125 N. E. 403, is also in point:

"Undue influence need not be proven by direct and positive evidence, but it may be inferred from or shown by the facts and circumstances in evidence. Nor is it necessary that the overt acts of undue influence should have been exercised at the exact time of the execution of the will and codicil, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time the will and codicil were made."

The principle is also recognized in Page on Wills (2d ed.), § 194, which reads as follows:

"Undue influence does not render a will invalid unless it operates at the time that the will is made and

causes its execution. The question, in cases of this sort, is not the time at which the influence was first exerted, which is immaterial, but whether such undue influence operates at the time of making the will. If undue influence is exercised before the will is made, but its influence persists until the will is made, it renders the will invalid."

Mrs. Nielson and her advisers were naturally anxious, in case of a contest of the will of June 2, they anticipating such a contest, to escape the consequences which would probably follow from consideration by the court of paragraph 8 of the June will, above quoted, in which paragraph Mrs. Hanson was made to state that she conveyed her farm to Johanna in consideration of her promise made to Johanna that the latter should have the farm if she left her home in Norway and came to live with Mrs. Hanson. The proposition that any such promise could have been made during the lifetime of Mrs. Hanson's son Carl, is, of course, ridiculous.

We find it unnecessary to consider the ruling of the trial court on the question of the burden of proof. We are convinced that the evidence preponderates in appellants' favor, irrespective of the burden of proof. The testimony is replete with circumstances, many in themselves insignificant, all tending to show the course of conduct of the persons who desired to induce Mrs. Hanson to make the Nielson family the chief beneficiaries of her bounty.

It is difficult to believe that Mrs. Hanson would have, of her own volition, abandoned the idea of setting up a fund for the care of her cemetery lot. It is argued that a bequest to her cousin in the July will would have answered this purpose, but we are not impressed with the strength of the testimony along this line.

The abandonment by Mrs. Hanson of the wish which

she long maintained of having her friend, Dr. Christensen, act as her executor; her ready substitution in the June will of Dr. Christensen's young and inexperienced nephew; the elimination of the nephew in the July will and the substitution of Johanna, whom she had never before named as her executrix, and in whose judgment she apparently lacked confidence; the fact that Mrs. Hanson, evidently at the suggestion of some other person, herself took the deed to Johanna to the court house to be filed for record and personally handed the same to her old friend, Mr. Haugen, the county auditor, with instructions that the same be recorded; have all been considered in reaching our conclusion.

It is to be observed that the trial court, at the close of the testimony, intimated that Mrs. Hanson, at the time of the execution of the will of June 2, was susceptible to the exercise of an undue influence, and that the opportunity to bring such influence to bear for the benefit of Johanna Nielson undoubtedly existed. The court intimated that the June will might not have been sustained, but felt that the will of July 21 stood upon a different basis, and that the same should be upheld. In the course of its opinion, the court, however, intimated that the questions of fact presented were difficult of determination, and that the decision was not easy to make.

We are unable to differentiate between the wills of June and July, 1930. We are satisfied that it appears from this record that both wills were brought about by undue influence exerted upon the mind of the testatrix, Louise Hanson, and that the deed from Mrs. Hanson to Mrs. Nielson, dated June 2, 1930, was also procured by undue influence.

The influence here exerted was strictly an interested influence. There can be no doubt but that Mr. Chris-

tensen expected to profit from any step which he could induce Mrs. Hanson to take in favor of Mrs. Nielson. In determining whether influence was or was not undue, it is proper to consider the motive behind the influence, and whether the same was interested or disinterested. This would not, of course, be of controlling importance, but should be given proper consideration.

In this connection, it is significant, also, to note that the persons concerned were not content to allow the matter to rest in a testamentary expression of Mrs. Hanson's supposed affection for and sense of obligation to her niece. It was deemed advisable to capitalize the situation which had been created by the immediate transfer of the title to the property by deed to Mrs. Nielson. This was certainly an unusual proceeding; one which Mrs. Hanson would never have thought of, and which we are convinced she never would have agreed to had she been in full possession of her faculties and carrying into execution her own wishes, free from undue influence on the part of interested persons.

The only order of the trial court before us for review is the order dismissing appellants' contest. The matter of the validity of the will of June 2 and the effect, if any, to be given to the deed executed that day by Mrs. Hanson in favor of Johanna Nielson, were never passed on by the superior court; and, while we have found it necessary, in order to determine the question presented, to-wit, the correctness of the order dismissing the will contest, to express an opinion upon these matters, this opinion is based upon the evidence in this record only, and there is nothing in connection therewith before us for review, nor do we decide any question save that here presented.

The order appealed from is reversed, with instructions to the trial court to sustain appellants' contest

as directed against the will of July 21, 1930. The decree admitting this will to probate will be vacated. The superior court will then proceed to determine such other questions as may be properly presented to it for decision.

TOLMAN, C. J., MITCHELL, HERMAN, and MILLARD, JJ., concur.

HOLCOMB, J., concurs in the result.

PARKER, J. (dissenting)—I dissent. We have the opportunity of viewing the evidence in this case only in cold typewriting. We did not see or hear any of the witnesses testify, as did the trial judge. Their testimony in important particulars is in conflict. While I concede that the record furnishes ground for the able argument of Judge Beals made in support of his conclusion that the will be set aside, my reading of the evidence convinces me that it does not so clearly preponderate against the decision of the trial court as to warrant us in reversing that decision. I do not think that we should substitute our opinion in place of his opinion, upon the record before us.

MAIN, J., concurs with PARKER, J.